**In re W. Michael NAWRATH, Esq.**

[749 A.2d 11]

No. 99-439

January 10, 2000. Pursuant to the recommendation of the Professional Conduct Board filed October 5, 1999, and approval thereof, it is hereby ordered that W. Michael Nawrath, Esq. be publicly reprimanded for the reasons set forth in the Board's report attached hereto for publication as part of the order of this Court. A.O. 9, Rule 8E.

Attorney Nawrath shall also be placed on probation for one year with the condi-

tions set forth in the attached report. The period of probation shall be deemed to have commenced on July 30, 1999.

## FINAL REPORT TO THE SUPREME COURT

This matter was presented to us by stipulated facts that we adopt as our own and incorporate herein by reference.

The parties also submitted a joint recommendation to the Board as to what conclusions of law should be drawn from these facts and what sanction should be imposed. Respondent submitted a waiver of certain procedural rights, including the right to withdraw the stipulated facts in the event that the recommended sanction was not imposed.

Respondent, respondent's counsel and Jessica Porter, bar counsel, appeared before us on July 9, 1999, and the parties presented oral argument in support of the joint recommendation of public reprimand and that respondent be placed on probation for a period of one year.

Upon consideration of the documents filed and the oral argument presented, we adopted the stipulated facts and the conclusions of law. For the reasons set forth below, the Board recommends to the Supreme Court that a public reprimand be imposed and that respondent be placed on probation for a period of one year.

A brief summary of the events leading to discipline are set forth below.

### Facts

1. Respondent is an attorney licensed to practice law in the state of Vermont. He was admitted to practice in 1981.

#### PCB File No. 99.177

2. In early 1997, respondent was retained to search the title and provide title insurance for business property in Bennington for a client, T.N. The initial title policy was for a long term lease, but in early 1998 T.N. decided to purchase the property in fee simple. The loan closing for the purchase took place out of state, and the documents were received by the respondent for recording on May 11, 1998.

3. On May 5, 1998 respondent attended a closing on the purchase of the fee and a mortgage back to the seller at the office of seller's attorney in Bennington.

4. Respondent recorded the documents from the Vermont closing on May 5, 1998.

5. The funds were received from the client from two sources, directly from client's in-house counsel in Alabama and from Chicago Title Insurance Company. Due to the double payment, there was an overpayment of the recording fees and the Vermont property transfer tax. The error was not discovered by the respondent until May 24, 1999.

6. T.N. received a title insurance commitment. Issuance of the leasehold policy from the 1997 closing was delayed because a mortgage discharge was not received from the out-of-state closing until September 10, 1997 and the property lacked a state permit for a previous subdivision which at the request of T.N. was resolved by respondent on February 17, 1998.

7. By this time, T.N. had made the decision to purchase the fee and the respondent had been told by the title insurance company to give a credit for the premium paid on the leasehold policy if the leasehold policy was surrendered. Respondent therefore held the leasehold policy in his file.

8. Upon return of the recorded documents from the closing on the fee, respondent erroneously awaited the return of the leasehold policy from his client T.N., before issuing the title insurance.

9. In May 1999 respondent was alerted by the firm's bookkeeper that there were still unissued title policies from the May 1998 closing. He found $4,033.00 still remaining in the trust account from the transaction of the previous May.

10. Respondent checked to see that all expenses of the closing had been paid and

assumed the $4,033.00 was for additional legal services. He transferred the trust funds to the Whalen and Nawrath operating account from which he also wrote a check to himself for $2,500.00.

11. On May 24, 1999 respondent's partner asked respondent about this removal of the trust funds and when the partner was told it was for unpaid legal services the partner found out that the firm had received a payment on May 13, 1998, of $486.00 for legal services related to the title search and zoning opinion letter, and a separate check for the commission on the title insurance for $1,340.50.

12. On May 28, 1999, respondent refunded the trust account $4,033.00 and wrote his client saying the money had been removed in error. He also enclosed a trust check reimbursing the client for $4,033.00.

13. On May 28, 1999, the same date that respondent wrote to his client T.N., respondent self-reported a trust account irregularity to the Professional Conduct Board.

14. On June 27, 1999, respondent billed his client $2,452.50 for his remaining unbilled legal services for resolving the permit issue and the preparations for and attendance to the 1998 closing. While unbilled, this obligation predated the obligation to refund the $4,033.00.

### PCB File No. 99.184

15. On November 23, 1998, respondent did a refinancing closing for a Mrs. B. of Manchester, Vermont. None of the original documents had been filed but remained in respondent's file along with a stale GMAC check for closing expenses until brought to the respondent's attention in June 1999. No priority was lost because respondent had prepared and obtained a mortgage subordination of Mrs. B's second mortgage. There were no intervening liens.

16. Because the original HUD-1 settlement statement erroneously listed the loan origination fee as being paid from the borrower's funds at closing, Mrs. B. was asked to sign a settlement statement that erroneously stated that she owed $144.78.

17. On June 14, 1999 after checking with the lender, respondent sent to Mrs. B. a revised HUD-1 settlement statement for her signature which indicated that Mrs. B. should have received $814.72 at the November 1998 closing. Mrs. B. received the $814.72 on or about June 22, 1999. Respondent has paid Mrs. B. interest on the $814.72 at the mortgage rate.

### PCB File No. 99.185

18. Respondent attended a closing on April 16, 1999 for an out-of-state client for the sale of a piece of property in Winhall, Vermont.

19. One week prior to the closing, respondent sent the proposed closing documents to the client and asked for certain information needed to apply for a Certificate of No Withholding from the Vermont Tax Department.

20. Respondent spoke to his client after the closing and asked how she wanted the net proceeds delivered to her. She said she would fax wiring instructions to her mother's account.

21. Respondent again reminded his client that he needed additional information regarding the costs of acquisition of the property for the Certificate of No Withholding.

22. The client did not send the wiring instructions at that time. She never did send the additional information requested.

23. On May 14, 1999, client's mother called and reported she had still not received the net proceeds from the sale of the home.

24. At respondent's request, she faxed wiring instruction to the respondent's office. Respondent did not see the fax.

25. On May 22, 1999, client's mother telephoned respondent again. He reported he still had not received the fax. She again faxed the wiring instructions.

Respondent then wired the net proceeds to her, less $3,350.00 held to satisfy the nonresident withholding tax obligation pending the receipt of the certificate.

26. When he still did not receive all the information he needed to file for the certificate from the client, respondent obtained the information from another attorney involved in the earlier closing and filed for the certificate.

27. Respondent received the tax certificate on May 27, 1999. He immediately faxed to the purchaser's attorney requesting authority to release the $3,350.00 to his client.

28. On May 28, 1999 (a Friday), purchaser's attorney left a phone message for respondent, who was in Bennington until after closing time, that respondent was authorized to release the $3,350.00 to his client.

29. On May 30, 1999 (a Sunday) respondent found the phone message and mailed the $3,350.00 to his client.

### PCB File No. 99.186

30. Respondent has a client for whom respondent has a general power of attorney. Respondent timely sought and was granted tax extensions until August 18, 1998 to file client's 1997 state and federal income tax returns.

31. Upon filing requests for the extensions, respondent paid the estimated taxes due in the amount of $2,250.00 on the federal taxes and $625.00 on the state taxes.

32. In November 1999, the Vermont Department of Taxes sent the respondent a letter stating that the 1997 state income tax return had still not been filed. Furthermore, on April 19, 1999, the Department of the Treasury sent a notice that the federal 1997 tax return had not been filed.

33. On June 10, 1999, respondent filed the state and federal returns for 1997. They show $126.00 due on the state return and $190.00 due on the federal return.

34. Respondent has stated he will personally pay any penalties and interest charges that are levied by either the state or federal tax authorities.

### GENERAL CONSIDERATIONS

35. Over the course of years, the respondent's financial and managerial arrangements with his partner have caused him significant stress and depression. Respondent was receiving psychiatric treatment and medication for this until a few years ago. Respondent discontinued this psychiatric treatment shortly after his treating psychiatrist committed suicide. In the last year the stress and depression has affected his attention span and his work. Respondent is now resuming counseling and has procured the assistance of a mentoring attorney, James Cormier, Esq. of Bennington to address this situation.

### Conclusions of Law

#### PCB File No. 99.177

1. The respondent violated DR 6-101(A)(3) by neglecting a legal matter entrusted to him by T.N. Specifically, the respondent neglected to issue the final title insurance policy on a title he had searched for T.N. and upon which he was entrusted the task of issuing the title insurance policy.

2. The respondent violated DR 9-102(B)(3) and DR 9-102(C) by failing to maintain a complete and accurate account of client funds. Specifically, due to an error by his client, the respondent received double payment for recording fees and property transfer tax, but respondent did not notice the double payment which amounted to $4,033.00 between the time of the original closing in May 1998 and May 1999 when it was reviewed.

#### PCB File No. 99.184

1. The respondent violated DR 6-101(A)(3) by neglecting a legal matter

entrusted to him by Mrs. B. Specifically, the respondent failed to timely file a mortgage reflecting that Mrs. B. had refinanced her original mortgage.

2. The respondent violated DR 6-101(A)(2) by failing to prepare for Mrs. B.'s refinancing in a manner that was adequate in the circumstances. Specifically, the respondent improperly prepared one of the settlement statements. As a result, the client was erroneously charged on the settlement statement for $811.72 she was due and it took seven months to discover the error and obtain the refund she was due from the mortgagee.

### PCB File No. 99.185

1. The respondent violated DR 6-101(A)(3) by neglecting a legal matter entrusted to him by his client. Specifically, the respondent was unable to file an application for a Certificate of No Withholding within 30 days of the closing. As a result, his client was not able to promptly access the $3,350.00 until respondent got the information from other sources, which was a period of six weeks. In addition, respondent did not pursue the client's failure to send the wiring instructions for the rest of the proceeds of the closing.

### PCB File No. 99.186

1. The respondent violated DR 6-101(A)(3) by neglecting a legal matter entrusted to him by his client. Specifically, the respondent, after paying the estimated tax and securing an extension of the time period in which to file client's state and federal tax returns for 1997, neglected to file the returns until June 1999.

### Sanctions

The Board recommends that the respondent be publicly reprimanded and placed on probation for one year.

In determining an appropriate sanction, the Board considered four factors: (1) the duty violated; (2) the mental state of the attorney; (3) the actual or potential injury caused by the violation; and (4) any aggravating or mitigating factors. See *In re Illuzzi*, 165 Vt. 598, 599, 683 A.2d 1008, 1009 (1996), citing American Bar Association Standards for Imposing Lawyer Discipline Section 3.0). An analysis of these factors indicates that a public reprimand would be appropriate.

### PCB File No. 99.177

1. *The Duty*

The respondent violated his duty to preserve his client's property. See ABA Standards for Imposing Lawyer Sanctions Section 4.1.

2. *State of Mind*

The respondent's mental state was one of negligence. Upon finding $4,033.00 in the account, respondent assumed the funds were for additional legal fees for which he had not been paid after seeing that other expenses of the closing had been paid. He transferred the funds to the firm's operating account and removed $2,500.00 therefrom in payment to himself. He did this without making an effort to determine that the actual fee owed to the firm was $2,452.50.

3. *Injury*

The respondent's failure to maintain accurate records caused injury in that it deprived T.N. of a net amount of $1,580.50 for over a year.

### PCB Files Nos. 99.184, 99.185, 99.186

1. *The Duty*

In each of these cases, the respondent violated a duty of diligence that he owed to a client.

2. *State of Mind*

The respondent's mental state was one of negligence.

3. *Injury*

a. *99.184*

Mrs. B. suffered little actual injury in that the respondent repaid her the money

owed to her. There was potential for injury, though, in that she might not have received the money she was owed by the mortgagee if respondent's files had not been inspected as a result of review by respondent's partner. Also, there was potential for injury to the mortgagee had an intervening lien been filed.

b. *99.185*

Respondent knew that he had client's funds from the proceeds of the closing, but did not promptly follow up when he did not receive the wiring instructions client was supposed to send him.

c. *99.186*

Client faced little potential financial injury due to the respondent's failure to timely file state and federal tax returns. The estimated taxes were paid in a timely manner. The client's unpaid tax liability was $315.00, which was paid on June 10, 1999. The final interest and penalties have yet to be calculated, but it should be noted that respondent has committed to personally paying any interest or penalties.

### Mitigating Factors

1. The respondent has no prior disciplinary record.

2. The respondent has maintained an open and cooperative attitude with bar counsel.

3. Respondent has made a good faith effort to rectify the consequences of the misconduct by promptly filing all necessary papers.

4. Respondent did not have dishonest or selfish motives.

5. Respondent's stress and depression is now being addressed by a psychologist. Its impact on his work will now be addressed by a mentoring attorney.

### Aggravating Factors

These cases show a pattern of misconduct for one year.

### Sanction

According to the ABA Standards, a reprimand is appropriate when a lawyer is negligent in dealing with client property and, as a result, causes injury or potential injury to the client. See ABA Standards for Imposing Lawyer Sanctions Section 4.13.

1. *PCB File No. 99.177*

The respondent was negligent when he discovered $4,033.00 in the trust account from the T.N. matter. In this case, respondent had established proper accounting procedures but failed to use them. Such a large amount of money should have triggered questions in the respondent's mind as to whether the account was accurate, and he should have found the double payment rather than transferring the amount to his firm's operating account.

2. *PCB Files Nos. 99.184, 99.185 & 99.186*

In cases involving neglect, "a reprimand is generally appropriate . . . when a lawyer is negligent and does not act with reasonable diligence in representing a client and causes injury or potential injury to a client." A reprimand is appropriate here due to the fact that respondent, over the past year, has failed to follow up on his files including timely filing of documents with local and state authorities.

### Conclusion

For these reasons, the Board believes that a public reprimand is appropriate. In addition, we recommend that respondent be placed on probation for one year and be required to observe the following conditions of probation:

1. No later than July 30, 1999, the respondent shall find a mentoring attorney, approved by the Office of Bar Counsel, who will have reviewed a summary, within applicable confidentiality requirements, of each of the respondent's open files.

2. No later than August 30, 1999, the respondent shall submit to his mentoring attorney a plan of action for each such file.

3. The respondent shall follow any reasonable suggestions made by the mentoring attorney.

4. In addition to the mentoring attorney's review of respondent's files, respondent shall also review his files, and if either review reveals any likely or probable violations of the Code of Professional Responsibility, respondent shall forthwith report the same to the Office of Bar Counsel.

5. The respondent shall not take any new cases or clients without the approval of his mentoring attorney, who must agree that the respondent can take on a new case without jeopardizing the interest of that client or existing clients.

6. The respondent shall keep all appointments with his treating psychologist.

7. No later than July 30, 1999, the respondent shall authorize his treating psychologist to inform the Office of Bar Counsel if he misses any appointments.

8. No later than July 30, 1999, the respondent shall direct and authorize his mentor and psychologist to inform the Office of Bar Counsel if at any time during the probationary year if either believes that the respondent's condition adversely affects his ability to practice law.

9. The respondent shall not violate the Code of Professional Responsibility.

10. The respondent shall promptly respond to requests from the Office of Bar Counsel that relate to his compliance, or lack thereof, with this agreement.

11. The Court may immediately suspend the respondent's license to practice law, without a hearing, upon presentation to the Court or the Professional Conduct Board of clear and convincing evidence that the respondent has materially violated the terms of this order. This agreement is subject to the condition that bar counsel shall immediately provide respondent with full disclosure of all evidence submitted to the Court and the Professional Conduct Board in support of any request to suspend respondent's license to practice law. It is subject to the understanding that respondent shall be permitted to appear and move for a dissolution of or modification of the order of suspension on two days notice to bar counsel and such motion will be heard and determined as expeditiously as the ends of justice require.

12. In the event that the Board or the Court desires to impose more stringent discipline than that stated above, this stipulation shall not be binding upon respondent nor shall any of its contents be used as evidence against him.